# No. 15-3805

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

UNITED STATES EX REL. GERASIMOS PETRATOS, ET AL.

*Plaintiffs-Appellants*,

v.

GENENTECH INC., ET AL.

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

## BRIEF FOR DEFENDANTS-APPELLEES

Lawrence S. Lustberg
Amanda B. Protess
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4731
llustberg@gibbonslaw.com

Matthew J. O'Connor
Mark W. Mosier
Matthew F. Dunn
David M. Zionts
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000
mmosier@cov.com

*Counsel for Defendants-Appellees*

**CORPORATE DISCLOSURE STATEMENT**

Defendants-Appellees Genentech, Inc. and Hoffmann-La Roche Inc. are wholly owned subsidiaries of Roche Holdings, Inc. Roche Holdings, Inc.'s ultimate parent is Defendant-Appellee Roche Holding Ltd, and Defendant-Appellee F. Hoffmann-La Roche Ltd is a wholly owned subsidiary of Roche Holding Ltd. Roche Holding Ltd has no parent corporation and is publicly traded on the Swiss Stock Exchange. On information and belief, Novartis AG holds either directly or indirectly more than 10% of Roche Holding Ltd's voting shares.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION .................................................................................. 1

STATEMENT OF ISSUES .................................................................... 2

STATEMENT OF THE CASE ................................................................ 3

      A.    Regulatory Framework ........................................................ 3

      B.    Approval And Reimbursement Of Avastin ........................ 5

      C.    Relator's Allegations Of Deficient Adverse Event Reporting ............. 8

      D.    Procedural History ............................................................ 10

STATEMENT OF RELATED CASES AND PROCEEDINGS ........................... 12

SUMMARY OF THE ARGUMENT .......................................................... 12

STANDARD OF REVIEW ...................................................................... 18

ARGUMENT ........................................................................................ 18

I.     The District Court Was Not Required To Deny The Motion To Dismiss Because It Had Allowed Relator To Amend His Complaint. ........ 18

II.    The District Court Correctly Held That Relator Failed To State A Claim Under The FCA. ........................................................................ 24

      A.    The Amended Complaint Fails To Allege That The Claims At Issue Are False. ............................................................ 25

            1.    The Claims For Avastin Are Not False Because The Government Considers It Reasonable And Necessary For The Uses At Issue. ................................. 26

      2.     Although Unnecessary To Its Holding, The District Court Correctly Concluded That Medically Accepted Uses Of A Drug Are Reasonable And Necessary ................................. 33

   B.     The Amended Complaint Fails To Allege Materiality. ..................... 37

   C.     The District Court's Conclusion That Relator Has Not Adequately Pleaded False Claims Does Not "Encourage Fraud." ................................................................................................. 40

   D.     The Government's Alternative Theories Are Not Presented By This Case And Would Not Supply A Basis For Reviving Relator's Claims. ............................................................................... 41

III.   The District Court Properly Dismissed Relator's Remaining Claims .......... 46

   A.     The Reverse False Claim Count Fails. ................................................ 46

   B.     The State Law And Conspiracy Counts Fail. ...................................... 50

IV.   The District Court Did Not Abuse Its Discretion In Denying Leave To Amend .................................................................................................... 51

V.   The District Court Lacked Personal Jurisdiction Over The Foreign Defendants. ................................................................................................ 53

CONCLUSION ................................................................................................. 56

CERTIFICATE OF COMPLIANCE ..................................................................... 58

CERTIFICATE OF SERVICE .............................................................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison Engine Co. v. U.S. ex rel. Sanders*,
　　553 U.S. 662 (2008) .................................................................45

*Almy v. Sebelius*,
　　679 F.3d 297 (4th Cir. 2012) ...............................................34, 35

*Ashcroft v. Dep't of Corr.*,
　　No. 05-CV-488, 2007 U.S. Dist. LEXIS 49079 (W.D.N.Y. July 6,
　　2007) ........................................................................................20

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009) .................................................................32

*U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*,
　　473 F.3d 506 (3d Cir. 2007) ....................................................47

*New York ex rel. Bodnar v. Sec'y of Health & Human Servs.*,
　　903 F.2d 122 (2d Cir. 1990) .....................................................28

*Bon Air Hotel, Inc. v. Time, Inc.*,
　　426 F.2d 858 (5th Cir. 1970) ...................................................19

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
　　229 F.3d 254 (3d Cir. 2000) ....................................................54

*Buck v. Hampton Twp. Sch. Dist.*,
　　452 F.3d 256 (3d Cir. 2006) ......................................................6

*Buckman Co. v. Plaintiffs' Legal Comm.*,
　　531 U.S. 341 (2001) ........................................................4, 25, 41

*Budhun v. Reading Hosp. & Med. Ctr.*,
　　765 F.3d 245 (3d Cir. 2014) ....................................................21

*Bussicolo v. Babcock Power, Inc.*,
　　No. 13-cv-07192, 2014 WL 6908771 (D.N.J. Dec. 8, 2014) .............20

*U.S. ex rel. Cestra v. Cephalon, Inc.*,
    No. 14-1842, 2015 WL 3498761 (E.D. Pa. June 3, 2015) .................................34

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)...........................................................................................24

*Craig v. Lake Asbestos of Quebec, Ltd.*,
    843 F.2d 145 (3d Cir. 1988) ..............................................................................55

*Culbreth v. Amosa (Pty) Ltd.*,
    898 F.2d 13 (3d Cir. 1990) ................................................................................55

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014)..................................................................................53, 54

*Fagan v. City of Vineland*,
    22 F.3d 1283 (3d Cir. 1994) ..............................................................18, 22, 23

*Filebark v. U.S. Dep't of Transp.*,
    555 F.3d 1009 (D.C. Cir. 2009).........................................................................21

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*,
    751 F.3d 150 (3d Cir. 2014) ..............................................................................36

*U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*,
    38 F. Supp. 3d 398 (S.D.N.Y. 2014) ...................................................................6

*U.S. ex rel. Galmines v. Novartis Pharm. Corp.*,
    No. 06-3213, 2013 WL 2649704 (E.D. Pa. June 13, 2013) ...............................29

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    131 S. Ct. 2846 (2011).......................................................................................53

*Gregg v. U.S. Indus., Inc.*,
    715 F.2d 1522 (11th Cir. 1983) .........................................................................19

*Hayman Cash Register Co. v. Sarokin*,
    669 F.2d 162 (3d Cir. 1982) ..............................................................................23

*Hays v. Leavitt*,
    583 F. Supp. 2d 62 (D.D.C. 2008)......................................................................29

*Heckler v. Ringer*,
    466 U.S. 602 (1984).................................................................28, 29, 32

*Kanter v. Barella*,
    489 F.3d 170 (3d Cir. 2007) ...............................................................52

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994)............................................................52

*Langevine v. D.C.*,
    106 F.3d 1018 (D.C. Cir. 1997).........................................................22

*Lindsey v. Butler*,
    No. 11-CV-9102 (RWS), 2013 U.S. Dist. LEXIS 88601 (S.D.N.Y.
    June 18, 2013)......................................................................................20

*Long v. Satz*,
    181 F.3d 1275 (11th Cir. 1999) ..........................................................52

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943)......................................................................45, 46

*Marten v. Godwin*,
    499 F.3d 290 (3d Cir. 2007) ...............................................................55

*Martin v. Port Auth. Transit of Allegheny Cty.*,
    115 F. App'x 556 (3th Cir. 2004) .......................................................19

*U.S. ex rel. Matheny v. Medco Health Sols., Inc.*,
    671 F.3d 1217 (11th Cir. 2012) ..........................................................49

*U.S. ex rel. Modglin v. DJO Global Inc.*,
    114 F. Supp. 3d 993 (C.D. Cal. 2015) ..................................................6

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983).................................................................................19

*Perez-Ruiz v. Crespo-Guillen*,
    25 F.3d 40 (1st Cir. 1994)..............................................................19, 22

*In re Plavix Mktg., Sales Practices & Prods. Liab. Litig.*,
    123 F. Supp. 3d 584 (D.N.J. 2015).................................................34, 35

*Powers v. Southland Corp.*,
  4 F.3d 223 (3d Cir. 1993) .................................................................20

*Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium*
  *Elektron, Inc.*,
  123 F.3d 111 (3d Cir. 1997) .............................................................23

*Rimbert v. Eli Lilly & Co.*,
  647 F.3d 1247 (10th Cir. 2011) ...................................................19, 22

*Roberts v. Ferman*,
  __ F.3d __, 2016 WL 3361493 (3d Cir. June 17, 2016)..............19, 23

*Shane v. Fauver*,
  213 F.3d 113 (3d Cir. 2000) .............................................................21

*U.S. ex rel. Simpson v. Bayer Corp.*,
  No. 05-3895 (JLL), 2013 WL 4710587 (D.N.J. Aug. 30, 2013)......34

*United States ex rel. Sobek v. Educ. Mgmt., LLC*,
  No. 10-131, 2013 WL 2404082 (W.D. Pa. May 31, 2013) ..............48

*Steel Co. v. Citizens for a Better Environment*,
  523 U.S. 83 (1998).............................................................................53

*United States ex rel. Stone v. OmniCare, Inc.*,
  No. 09 C 4319, 2011 WL 2669659 (N.D. Ill. Jul. 7, 2011)..............47

*United States ex rel. Taylor v. Gabelli*,
  345 F. Supp. 2d 313 (S.D.N.Y. 2004) ..............................................48

*TCF Film Corp. v. Gourley*,
  240 F.2d 711 (3d Cir. 1957) .............................................................23

*United States ex rel. Thomas v. Siemens AG*,
  708 F. Supp. 2d 505 (E.D. Pa. 2010).........................................47, 48

*Tillman v. CSX Transp., Inc.*,
  929 F.2d 1023 (5th Cir. 1991) ..........................................................20

*United States v. Lagerbusch*,
  361 F.2d 449 (3d Cir. 1966) .............................................................46

*Strom ex rel. U.S. v. Scios, Inc.*,
　　676 F. Supp. 2d 884 (N.D. Cal. 2009) ...............................................29

*United States v. AseraCare Inc.*,
　　__ F. Supp. 3d __, No. 2:12-CV-245-KOB, 2016 WL 1270521
　　(N.D. Ala. Mar. 31, 2016) .................................................................20

*United States v. Caremark, Inc.*,
　　634 F.3d 808 (5th Cir. 2011) .............................................................49

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
　　136 S. Ct. 1989 (2016) ................................................................*passim*

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
　　659 F.3d 295 (3d Cir. 2011) ........................................18, 25, 38, 45

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
　　389 F.3d 1251 (D.C. Cir. 2004) ........................................................52

*Williams v. Runyon*,
　　130 F.3d 568 (3d Cir. 1997) .............................................................19

*Wisdom v. First Midwest Bank, of Poplar Bluff*,
　　167 F.3d 402 (8th Cir.1999) ........................................................42, 52

**Statutes**

21 U.S.C. § 355 .......................................................................................4

31 U.S.C. § 3729 ............................................................................*passim*

42 U.S.C § 262 .......................................................................................4

42 U.S.C. § 1320c-5 .........................................................................30, 31

42 U.S.C. § 1395. ..........................................................................*passim*

42 U.S.C. § 1395x .......................................................................5, 34, 35

42 U.S.C. § 1395u ...................................................................................5

42 U.S.C. § 1396r-8 .........................................................................5, 26

**Regulations and Regulatory Materials**

21 C.F.R. § 314.50 ................................................................36

21 C.F.R. § 600.80 .................................................................4

71 Fed. Reg. 3,922 (Jan. 24, 2006) ............................................6

76 Fed. Reg. 27332 (May 11, 2011) ...........................................7

77 Fed. Reg. 11554 (Feb. 27, 2012) ..........................................7

Proposal to Withdraw Approval for the Breast Cancer Indication for
   Avastin (Bevacizumab) (Decision of the Commissioner), Docket
   No. FDA 2010-N-0621 (Nov. 18, 2011) ..........................7, 27

**Other Authorities**

Medicare Benefit Policy Manual, CMS Pub. 100-2 ...............7, 34, 36, 37

S. Rep. No. 99-345 (1986) .......................................................48

18B Wright & Miller, Fed. Prac. & Proc. § 4478.1 (2d ed.) ...................21

**INTRODUCTION**

Relator's lawsuit was properly dismissed because it was based on a fundamentally flawed theory of liability under the False Claims Act ("FCA"), 31 U.S.C. § 3729. Relator's claims are premised on a disagreement with his supervisors concerning the databases that Genentech used in reporting adverse events experienced by patients taking Avastin, an FDA-approved cancer treatment for which the federal and state governments pay under Medicare and other programs. However, Relator does not allege that Genentech's safety-related reporting violated any statute or regulation. Nor does he allege that but for the alleged reporting deficiencies, the FDA would have revoked its approval for Avastin, or that the Government would have stopped reimbursing for it. In fact, since Relator brought his complaints to the Government five years ago, the FDA has approved Avastin for additional indications, and it continues to be reimbursed under Medicare and other programs.

Relator nonetheless speculates that an analysis of his preferred sources might have produced unfavorable data for patients at risk of certain side effects. He further believes that this hypothetical finding, while not sufficient to lead to any changes on the FDA-approved label for Avastin, might somehow have led physicians to prescribe less Avastin for such patients—notwithstanding the warnings for those side effects already prominently displayed on the FDA-

approved label. Relator claims that by causing these physicians to prescribe Avastin for FDA-approved uses, Genentech caused the submission of false claims for reimbursement in violation of the FCA.

A fundamental and dispositive defect in Relator's case is that the Government considers Avastin a reasonable and necessary treatment for every use Relator challenges. Relator does not contend otherwise, or plead that this determination has been infected by any alleged fraud. Instead, he argues that if *individual physicians* had known about the allegedly deficient reporting, *they* would have disagreed with CMS and not considered Avastin reasonable and necessary under the Medicare statute. As the district court recognized, Relator's theory rests on the view that the statutory "reasonable and necessary" determination is made by doctors, not the Government. The Supreme Court, other courts, and the Government's own *amicus* brief in this case disagree with Relator: the Government decides. For this and additional reasons, the district court's decision should be affirmed.

## STATEMENT OF ISSUES

1. Whether the law-of-the-case doctrine precluded the district court from granting Genentech's motion to dismiss on the ground that the court had previously granted Relator leave to amend his complaint.

2. Whether the district court correctly held that Relator failed to state a claim under the FCA where he did not allege that the Government considered any prescription for Avastin not to be "reasonable and necessary," or that the Government would have done anything differently but for the alleged fraud.

3. Whether the district court correctly held that Relator's other claims— involving reverse false claims, state law claims, and conspiracy claims—also fail because they depend on the same flawed theory that prescribing physicians make the required reimbursement determination under the Medicare statute.

4. Whether the district court acted within its discretion in denying Relator's request to amend his complaint for a second time when Relator's request consisted of less than a single sentence and offered no explanation of how he would amend his complaint.

5. Whether the court lacked personal jurisdiction over the foreign defendants where there is no record evidence that these defendants have any connection with the United States.

## STATEMENT OF THE CASE

### A. Regulatory Framework

The United States has a comprehensive federal statutory and regulatory framework that governs approval of, and reimbursement for, biological medicines ("biologics"), as well as other medicines. Congress has delegated to the Food and

Drug Administration ("FDA"), an agency within the Department of Health and Human Services ("HHS"), the authority to regulate biologics such as Avastin. 42 U.S.C § 262. And it has delegated to the Centers for Medicare and Medicaid Services ("CMS"), a separate division of HHS, the authority to make reimbursement decisions in administering the Medicare and Medicaid programs. 42 U.S.C. §§ 1395 *et seq.*; 1396 *et seq.*

The FDA's responsibilities include oversight of the development, approval, and post-approval review of biologics. 42 U.S.C § 262. The agency approves an application for a biologic if, after extensive review, it determines that, among other things, the product is safe, pure, and potent. 42 U.S.C. § 262(a)(2)(C)(i)(I). Thereafter, the FDA continues to monitor the medicine's safety and effectiveness, and may withdraw approval or require a change in the product's labeling. *Id.* § 262(a)(2)(D); 21 U.S.C. § 355(o). To assist in these determinations, the FDA requires manufacturers to submit reports for "[a]ny adverse event associated with the use of a biological product in humans, whether or not considered product related[.]" 21 C.F.R. § 600.80. The agency has "ample" authority to enforce its regulations, including for fraud committed in the approval and post-approval review of biologics and other medicines. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).

The federal government (and, as to Medicaid, state governments) reimburses for biologics such as Avastin under the Medicare and Medicaid programs, which are administered by CMS.  Under Medicare Part B, the Medicare program at issue here, the Government must reimburse for "reasonable and necessary" costs incurred when the medicine is used for a "medically accepted indication."  42 U.S.C. § 1395y(a)(1)(A); *id.* § 1395u(o)(1);  *id.* § 1395x(t)(2)(A).  A medically accepted indication includes a use of a drug or biologic that has been approved by the FDA, as well as "off-label" uses of an approved product that are supported by specified medical compendia, unless the HHS Secretary has determined that the use is not medically appropriate or the use is identified as not indicated in one or more such compendia.  42 U.S.C. § 1395x(t)(2)(B).[1]

## B.     Approval And Reimbursement Of Avastin

The FDA first approved Genentech, Inc.'s application for Avastin in 2004 for the first-line treatment of patients with metastatic carcinoma of the colon and

---

[1] Medicaid must reimburse for "covered outpatient drugs" such as Avastin if the drug is used for "medically accepted indications," subject to certain limitations.  42 U.S.C. § 1396r-8(k)(2), (6); *id.* § 1396r-8(d)(1).  As with Medicare, a "medically accepted indication" for purposes of Medicaid is "any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act . . . or the use of which is supported by one or more citations included or approved for inclusion in any of the [authorized] compendia . . . ."  *Id.* § 1396r-8(k)(6).  There is no "reasonable and necessary" requirement for reimbursement under Medicaid.

rectum.  Supp. App. 2-3.[2]  Since that time, the FDA has approved multiple

supplemental applications for additional indications.  *Id.*  Although the FDA has

known about Relator's allegations since June 2011, it has approved three

additional indications for Avastin since that time, including as recently as

November 2014.  Supp. App. 59-73.  The approval process has included extensive

safety reviews, the results of which are reflected on the FDA-approved label for

Avastin.  An FDA-approved label represents the agency's formal, authoritative

conclusions regarding the conditions under which the medicine can be used safely

and effectively, including side effects and other safety precautions that should be

considered when prescribing it.  *See* 71 Fed. Reg. 3,922, 3,934 (Jan. 24, 2006).

Avastin's FDA-approved label has always included warnings for various

potential side effects, including every side effect identified by Relator:

hypertension, bleeding, gastrointestinal perforation, surgery and wound healing

complications, proteinuria, and (since 2006) nasal septum perforation.  *See* Supp.

App. 4-56.  These side effects were therefore well known to prescribing

---

[2] In deciding a motion to dismiss, courts may rely on "items subject to judicial
notice" and "matters of public record."  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d
256, 260 (3d Cir. 2006); *see also U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 38 F.
Supp. 3d 398, 406 n.6 (S.D.N.Y. 2014) (taking judicial notice of public CMS
document); *U.S. ex rel. Modglin v. DJO Global Inc.*, 114 F. Supp. 3d 993, 1003
n.43 (C.D. Cal. 2015) (same).

physicians.  The FDA has never denied or withdrawn approval of Avastin for

individuals considered to be at risk for such side effects.

CMS has issued a "coverage determination" for Avastin.  Supp. App. 84-85.

That determination advises that the medicine is "eligible for coverage" under

Medicare "when used in accordance with FDA-approved labeling . . . , when the

off-label use is supported in one of the authoritative drug compendia [listed in the

statute], or when the Medicare Administrative Contractor (MAC) determines an

off-label use is medically accepted based on guidance provided by the Secretary."

*Id.*  Covered off-label use includes treatment of metastatic breast cancer, a use the

compendia support, and which "[CMS] has said that it is continuing to reimburse."

Proposal to Withdraw Approval for the Breast Cancer Indication for Avastin

(Bevacizumab) (Decision of the Commissioner), Docket No. FDA 2010-N-0621,

at 4 (Nov. 18, 2011).[3]

---

[3] The FDA withdrew the metastatic breast cancer indication from Avastin's label in
November 2011.  App. 297; *see also* 77 Fed. Reg. 11554, 11555 (Feb. 27, 2012).
Based on post-approval trials submitted by Genentech, the FDA concluded that the
trials failed to "verify clinical benefit with respect to [the metastatic breast cancer]
indication," which changed "the risk/benefit assessment that supported the initial
approval."  76 Fed. Reg. 27332, 27334 (May 11, 2011).  This indication, however,
continues to be supported by the compendia and reimbursed by CMS.  *See* Supp.
App. 75-76 (DrugDex listing); Supp. App. 78 (Clinical Pharmacology listing);
Supp. App. 80 (NCCN and Biologics Compendium listing); Supp. App. 82-83
(AHFS Drug Information listing, providing an "equivocal" recommendation); *see
generally* Medicare Benefit Policy Manual, CMS Pub. 100-2, Chapter 15, § 50.4.5
(continued…)

## C. Relator's Allegations Of Deficient Adverse Event Reporting

The allegations in this case relate to supposed deficiencies in Genentech's review and reporting about adverse events and other safety-related information. Relator Gerasimos Petratos claims that his supervisors ignored his advice to use databases that he believed were superior to those Genentech was using for purposes of making adverse event and other safety-related submissions. App. 303-21, 329-36, 337-41.

Relator does not allege that his preferred databases were required by the FDA, or by any statute or regulation. He does not allege that Genentech concealed the identity of the databases it utilized, or that the FDA was unaware of the relative merits of the various databases. He does not allege what the results of a full analysis of the respective databases would have been. And he does not allege that, had Genentech included information from his preferred databases, the FDA would have withdrawn or limited its approval of Avastin, or that CMS would not have reimbursed for any FDA-approved or compendia-supported use of Avastin. Relator has, in fact, disavowed any suggestion that this case seeks to "show that the FDA would have acted differently." Pl.'s Opp. to Mot. to Dismiss, Dkt. No. 33, at 2 (Oct. 1, 2013).

---

(explaining how to determine whether the four relevant compendia support a particular use of a drug).

Relator instead alleges that, if Genentech had used his suggested databases, at least some doctors would not have prescribed Avastin, or would have prescribed lower doses, to subgroups of patients "at risk" for certain side effects (hypertension, bleeding, gastrointestinal perforation, surgery and wound healing complications, nasal septum perforation, and/or proteinuria). App. 303. Specifically, Relator speculates that if Genentech had used the non-FDA-required databases he advocated, and if an analysis of those databases had resulted in negative safety information that was not otherwise known, and if that unfavorable data had been widely disseminated, some physicians would have made different prescription decisions. Relator proffers this hypothesis even though all of the side effects he invokes were already the subjects of prominent warnings on the FDA-approved label.

In June 2011, Relator disclosed his allegations to the FDA. App. 337. In the five years since that disclosure, the FDA has not only maintained its approval of Avastin for the "at-risk" population Relator identifies, but has approved three additional indications for Avastin. App. 59-73. CMS has also continued to reimburse for all FDA-approved or compendia-supported uses of Avastin, including for the patients Relator alleges are "at-risk."

**D.     Procedural History**

On June 27, 2011, Relator filed a *qui tam* action under the False Claims Act and related state laws against Genentech.  The United States and the named states declined to intervene.  Notice of Election to Decline Intervention, Dkt. No. 5 (Oct. 22, 2012).

Relator's original legal theory was that Genentech made implicit false certifications of compliance with adverse event reporting regulations, which caused healthcare providers' claims for reimbursement for Avastin to be false.  The Government filed a Statement of Interest, explaining that "[c]ompliance with the adverse event reporting requirements is not, in itself, a material precondition of payment under Medicare or Medicaid," and an alleged violation of those requirements is therefore "insufficient to state an FCA claim."  United States' Statement of Interest, Dkt. No. 35-1, at 2-3 (Oct. 7, 2013).  The district court, in an opinion by Judge Cavanaugh, agreed with the Government, and dismissed the complaint in substantial part.  App. 35.

Following Judge Cavanaugh's retirement, the case was reassigned to Judge Wigenton, who granted Relator leave to amend his complaint.  App. 49.  The amended complaint pivoted to a new legal theory.  Now Relator maintains that Genentech's failure to use his preferred databases caused physicians to make different medical judgments than they otherwise would have in prescribing Avastin

to "at-risk" patients.  According to Relator, if particular physicians had been aware of the information allegedly in these databases, then some of them would not have considered Avastin a "reasonable and necessary" treatment for particular patients, making claims for reimbursement by those particular physicians for those particular patients false.[4]

The district court, in a decision by Judge Arleo (to whom the case had again been reassigned), dismissed the complaint in its entirety.  The court observed that "this dispute comes down to whether medically 'reasonable and necessary' is assessed by doctors individually or is defined by the regulatory scheme."  App. 16. Relying on decisions of "the Supreme Court and the majority of courts that have directly addressed this issue," the court concluded that "medically 'reasonable and necessary' is a determination made by the relevant agency, not individual doctors." App. 16-17.  This conclusion rendered the complaint "fatally deficient," because Relator made no factual allegations that either the FDA or CMS would have acted differently but for the alleged reporting deficiencies.  App. 18-19.

The court also held that Relator had not stated a claim for "fraud on the compendia" with respect to off-label uses of Avastin.  App. 19.  Relator had

_____

[4] In his amended complaint, Relator also added as defendants Hoffman La-Roche Inc., F. Hoffmann-La Roche Ltd., and Roche Holding Ltd.  For simplicity, this brief uses the collective term "Genentech" because Relator's allegations primarily focus on that entity.

included "[o]nly a single paragraph" in his complaint supporting that theory, and his allegations were "plainly insufficient." *Id.* Although Relator alleged that a particular physician's "opinion on the risk-benefit profile for Avastin would have changed," the district court found "[c]onspicuously absent" any allegation that "the compendia would have changed." *Id.* The court also dismissed Relator's "reverse false claim" counts as redundant of his direct false claim counts, and dismissed his conspiracy and state law claims for the same reasons the court dismissed the primary FCA claims.

Defendants F. Hoffmann-La Roche Ltd. and Roche Holding Ltd. (the "Foreign Defendants") moved to dismiss for lack of personal jurisdiction. Because the district court granted the U.S. Defendants' motions to dismiss, it dismissed the identical claims against the Foreign Defendants without reaching issues of personal jurisdiction. App. 5-6 n.1.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Defendants are not aware of any related cases or proceedings.

## SUMMARY OF THE ARGUMENT

I. Relator's lead argument is that because Judge Wigenton allowed him to amend his complaint, Judge Arleo could not dismiss the amended complaint absent "exceptional circumstances." But it is well-settled that the law of the case doctrine does not prevent a district court from revisiting its previous interlocutory orders,

even to grant a motion to dismiss that had previously been denied. While this Court has stated that a district judge should show "comity" toward the decisions of a predecessor judge, it has also recognized the court's "discretion" to revisit earlier rulings. Judge Arleo's decision to dismiss a complaint that she determined presented no valid legal claim was plainly within her discretion.

II. The district court correctly held that Relator failed to state a claim under the FCA. Relator's claim fails to allege both falsity and materiality.

A. 1. Relator's theory is that certain claims for reimbursement of Avastin were "false" because they falsely certified that the medicine was "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). But there is no dispute that CMS considers Avastin a "reasonable and necessary" cancer treatment. Relator instead argues that the reasonable and necessary determination is made by physicians, and that had Genentech disclosed additional information, certain physicians would not have considered their prescriptions reasonable and necessary. That theory has been squarely rejected by the Supreme Court, other courts, and the Government's *amicus* brief in this case, all of which establish that the Government, not individual doctors, decides whether the use of a medicine is "reasonable and necessary" and therefore reimbursable. Any other result would unreasonably bind the Government's reimbursement decisions to the subjective views of various doctors, and create a patchwork reimbursement regime Congress could not have intended.

Because CMS makes the statutory determination that a treatment is reasonable and necessary, and there is no allegation that Genentech's actions affected CMS's decision that Avastin is reasonable and necessary for the uses at issue, Relator has failed to allege that any claim for Avastin violates any statute or regulation. Moreover, even if individual physicians were the proper focus, Relator's allegation that physicians would not prescribe Avastin to particular classes of patients is simply implausible, in light of the FDA's decision to continue approving the medicine, and CMS's decision to continue reimbursing for it, even after disclosure of Relator's allegations.

2. Relator objects to the district court's further conclusion that the "reasonable and necessary" standard is coterminous with the "medically accepted" requirement. That issue is a red herring, because CMS has specifically announced that in the case of Avastin, it does reimburse for every use that is medically accepted, *i.e.*, that is approved by the FDA or supported by the compendia. In any event, the district court was correct. Where the FDA or authorized compendia have exercised their expertise to determine that use of a medicine is appropriate, it would make little sense to deem that use unnecessary or unreasonable. Relator and the Government attempt to distinguish the "reasonable and necessary" determination as reflecting the circumstances of individual patients, but

individualized facts are in fact relevant to whether a use is medically accepted for a particular patient.

B.  Even if certain physicians would not have concluded that Avastin prescriptions were reasonable and necessary, and even if that conclusion would have established a violation of the Medicare statute, it would not have been material to payment.  As the Supreme Court recently confirmed, the FCA's materiality standard is "demanding," and the fact that the Government pays a claim despite knowledge of a violation is strong evidence that the violation is not material.  Here, there are no allegations that CMS would not have reimbursed for Avastin had Genentech's alleged deficiencies been cured.

C.  Relator is incorrect in contending that dismissal of his complaint creates a "loophole" in the FCA.  He suggests that the district court allowed a fraud on the FDA and compendia to "immunize" a fraud on physicians.  But the district court properly found that the complaint does not adequately plead any fraud that caused the Government or the compendia to make determinations they otherwise would not have made.  Relator's broad policy arguments ignore the fundamental pleading deficiencies identified by the district court.

D.  The Government takes no position on whether Relator has stated a claim, but suggests two theories it believes could be viable in an appropriate case.  Neither applies here or warrants reversal.  First, the Government states that in

"rare" cases, violations of adverse-event-reporting requirements could cause false claims to be presented, if the fraudulent conduct actually caused the FDA to approve the drug application or decline to revoke it. No such theory is presented here; Relator has in fact disavowed any claim that the FDA would have acted differently.

Second, the Government posits a "fraud in the inducement" theory that, under certain conditions, fraudulently inducing physicians to prescribe a treatment could result in false claims. That theory is also not presented by Relator. Moreover, to the extent the Government suggests that a "fraud in the inducement" theory could succeed *even if* CMS would find the prescription reasonable and necessary and reimburse for it, the Court should not adopt it. Such a claim would not be false (because it would not violate the "reasonable and necessary" requirement) or material (because CMS would pay anyway).

III.  A.  Relator also alleges that Genentech caused obligations to repay the Government to be concealed, in violation of the FCA's "reverse" false claims provision. He does not dispute, however, that "reverse" false claims may not be redundant of direct false claims. Here, they plainly are: the alleged obligation is to refund the Government for Avastin reimbursements that were not reasonable and necessary, which is just the mirror-image of the reverse false claims. Even if Relator's claim could survive that redundancy, his reverse false claims fail because

he has not adequately alleged violations of the "reasonable and necessary" requirement.

B. Relator does not dispute that his conspiracy and state law claims cannot succeed if his FCA claims fail, which they do.

IV. The district court did not abuse its discretion in denying Relator a second opportunity to amend his complaint. Relator's request for leave to amend was cursory and unexplained. In neither the district court nor in this Court has Relator explained how he proposes to amend the complaint to overcome its deficiencies. In these circumstances, denial of leave to amend is not an abuse of discretion.

V. The claims against the Foreign Defendants should also be dismissed because the district court lacked personal jurisdiction over them. The Foreign Defendants have no presence in the United States, and certainly no presence sufficient to make them at home in this forum for purposes of general jurisdiction. Relator also cannot establish specific jurisdiction. Relator alleges that Genentech, not the Foreign Defendants, controls sales and marketing in the United States, and is responsible for reporting safety-related issues; he identifies nothing that the Foreign Defendants allegedly did leading to the submission of false claims.

## STANDARD OF REVIEW

A district court's decision to reconsider a predecessor judge's ruling is reviewed for abuse of discretion. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994).

This Court "exercise[s] plenary review of the District Court's order granting appellees' motion to dismiss for failure to state a claim." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011).

The district court's denial of Relator's request for leave to amend his complaint is reviewed for abuse of discretion. *Wilkins*, 659 F.3d at 302.

## ARGUMENT

### I.   The District Court Was Not Required To Deny The Motion To Dismiss Because It Had Allowed Relator To Amend His Complaint.

Relator's lead argument is that the district court lacked authority to decide Genentech's motion to dismiss according to its best view of the law. Instead, because the court (through a predecessor judge) had previously granted Relator leave to amend his complaint, Relator believes that it was bound to deny the motion to dismiss absent "exceptional circumstances." Relator Br. 22. Relator's apparent view is that Judge Wigenton's interlocutory order granting leave to amend not only prohibited Judge Arleo from dismissing the case, but also prevents a superior court – this Court – from deciding *de novo* whether he has stated a claim. This contention is baseless.

Although he avoids naming it, Relator invokes the law of the case doctrine. That doctrine is plainly inapplicable, because "every order short of a final decree is subject to reopening at the discretion of the district judge." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983); *see also Roberts v. Ferman*, __ F.3d __, 2016 WL 3361493, at *6 (3d Cir. June 17, 2016) ("We also have held that 'the law of the case doctrine does not limit the power of trial judges to reconsider their prior decisions' . . ." (quoting *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997))). Accordingly, "[i]nterlocutory orders remain open to reconsideration and do not constitute the law of the case." *Martin v. Port Auth. Transit of Allegheny Cty.*, 115 F. App'x 556, 560 (3th Cir. 2004); *see also Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1252 (10th Cir. 2011) ("law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another"); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders . . . remain open to trial court reconsideration, and do not constitute the law of the case."); *Gregg v. U.S. Indus., Inc.*, 715 F.2d 1522, 1530 (11th Cir. 1983) ("Ordinarily law of the case applies only where there has been a final judgment and not to interlocutory rulings."); *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 862 (5th Cir. 1970) ("[B]ecause the order was interlocutory, the court at any time before final decree [could] modify or rescind it" (citations and internal quotation marks omitted)).

Here, Relator claims that the district court's hands were tied by its earlier decision granting him leave to amend his complaint under Rule 15. But "the grant of leave to amend [is] an [unappealable] interlocutory order." *Powers v. Southland Corp.*, 4 F.3d 223, 229 (3d Cir. 1993) (quoting *Tillman v. CSX Transp., Inc.*, 929 F.2d 1023, 1028-29 (5th Cir. 1991)). Indeed, courts routinely consider motions to dismiss after granting leave to amend. *See, e.g.*, *Bussicolo v. Babcock Power, Inc.*, No. 13-cv-07192, 2014 WL 6908771, at *2-3 (D.N.J. Dec. 8, 2014); *Lindsey v. Butler*, No. 11-CV-9102 (RWS), 2013 U.S. Dist. LEXIS 88601, at *15 (S.D.N.Y. June 18, 2013); *Ashcroft v. Dep't of Corr.*, No. 05-CV-488, 2007 U.S. Dist. LEXIS 49079, at *20 (W.D.N.Y. July 6, 2007); *see also United States v. AseraCare Inc.*, __ F. Supp. 3d __, No. 2:12-CV-245-KOB, 2016 WL 1270521, at *1-2 (N.D. Ala. Mar. 31, 2016) (after holding a trial on the Government's $200 million FCA claims, court found that it had "incorrectly instructed the jury on the falsity element," granted a new trial, and then "gave notice that it would *sua sponte* consider summary judgment" for defendant, which it granted). Nothing the district court may have decided in granting leave to amend could prevent that court from reaching a different conclusion at a later stage in the case, including in resolving a motion to dismiss.[5]

---

[5] Moreover, Relator could not have been surprised by the motion to dismiss his amended complaint—the parties entered a stipulation contemplating that if leave to (continued…)

Relator argues that by granting leave to amend, the district court effectively "address[ed] whether Relator's Amended Complaint stated a claim under the FCA." Relator Br. 23 (citing *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000), and *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014)). That is at best an exaggeration. Leave to amend is given "freely" and whenever "justice so requires." Fed. R. Civ. P. 15(a)(2). It is often considered on less fulsome briefing than what the parties would provide on a motion to dismiss. And the district court's decision of whether amendment is futile is "within its discretion," not subject to *de novo* review like a decision on a motion to dismiss. *Budhun*, 765 F.3d at 259.

But even if granting leave to amend were *identical* to denying a motion to dismiss, that would still not change the fact that the law of the case doctrine is inapplicable. It is well-settled that "[d]enial of a motion to dismiss may be followed by an order granting dismissal." 18B Wright & Miller, Fed. Prac. & Proc. § 4478.1 (2d ed.) (citing decisions of the First, Second, Fifth, Sixth, Ninth, and D.C. Circuits); *see also Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) ("The district court's first denial of dismissal was never a final judgment and never subject to appeal, and such '[i]nterlocutory orders are not

---

amend were granted, a motion to dismiss would follow. *See* Supp. App. 57-58 (Joint Stipulation).

subject to the law of the case doctrine and may always be reconsidered prior to final judgment'" (quoting *Langevine v. D.C.*, 106 F.3d 1018, 1023 (D.C. Cir. 1997))). Indeed, when Relator was dissatisfied with Judge Cavanaugh's ruling on the original motion to dismiss, he urged that Judge Wigenton was not bound, arguing that the decision was "[a]t most . . . an interlocutory order" not subject to the law of the case doctrine. Pl.'s Reply in Supp. of Mot. to Am. Compl., Dkt. No. 54, at 2-3 (June 30, 2014) (citing *Rimbert*, 647 F.3d at 1252, and *Perez-Ruiz*, 25 F.3d at 42).

The fact that this case was reassigned to a new judge does nothing to affect the inapplicability of the law of the case doctrine. The doctrine "does recognize that as a matter of comity a successor judge should not lightly overturn decisions of his predecessors in a given case." *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994). But this Court has made clear that whether to do so is within the district court's "discretion"; the law of the case doctrine "does not limit the power of trial judges from reconsidering issues previously decided by a predecessor judge from the same court." *Id.* Relator makes no effort to show how Judge Arleo, with the benefit of much more extensive briefing than was before Judge Wigenton, abused her discretion in dismissing the complaint.

Instead, Relator claims that *Judge Arleo* was required to justify her decision by "exceptional circumstances," and failed to do so. Relator Br. 22. For this

proposition, Relator principally relies on *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162 (3d Cir. 1982) and *TCF Film Corp. v. Gourley*, 240 F.2d 711 (3d Cir. 1957). Yet both cases are cited in *Fagan*, and are entirely consistent with its holding that a district judge has discretion to revisit a predecessor judge's decision. *Sarokin* held that the law of the case applies to an order transferring a case, in light of the "particular problems" of allowing a case to be repeatedly re-transferred. 669 F.2d at 167. Moreover, while Relator points to some of the grounds noted in *Sarokin* that could justify a deviation from the original decision, he neglects to mention a significant one: that the decision was "clearly erroneous" and adhering to it would "work a manifest injustice." *Id.* at 170.[6] Here, Judge Arleo necessarily decided that allowing a case premised on a fundamentally defective legal theory to proceed would be clearly erroneous and unjust. *Gourley*, moreover, far from supporting Relator's view, confirms that it is "entirely within" the "discretion" of a district judge to reconsider a decision made by another judge who had been temporarily assigned to the case. 240 F.2d at 714.

Finally, it is worth considering what Relator's approach would mean in practice. Judge Arleo considered the extensive briefing and exhibits put forward

---

[6] *Sarokin* left open the question whether this Court would recognize a "clearly erroneous" exception to the law of the case doctrine. It subsequently has done so. *See Roberts*, 2016 WL 3361493, at *6; *Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997).

by the parties, and reached the reasoned decision that even if Relator could prove every allegation in his complaint, he would not be entitled to any relief. Relator's position is that Judge Arleo should have allowed an entirely hypothetical proceeding to go forward based on a legal theory she considered fundamentally defective. Moreover, even though this case is now on appeal from a final judgment, Relator would have this Court restrict its review to whether one district judge should have deferred to another, and remand for the case to go forward *even if this Court agrees with Judge Arleo on the merits. But see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("a district court's adherence to the law of the case cannot insulate an issue from appellate review"). Neither the law of the case doctrine nor any other rule requires such an odd result.

## II. The District Court Correctly Held That Relator Failed To State A Claim Under The FCA.

Relator contends that Genentech violated the FCA by causing the submission of reimbursement claims that falsely certified that the prescriptions for Avastin were "reasonable and necessary" under the Medicare statute. Relator Br. 27-34 (citing 31 U.S.C. § 3729(a)(1)(A)). To survive a motion to dismiss on this implied false certification theory, Relator must adequately plead both that the reimbursement claims were false, and that their misrepresentations were material

to the Government's decision to pay the claims.  *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016).[7]

Relator cannot meet either requirement.  He does not adequately allege the existence of a false claim because his allegations do not establish that any prescriptions of Avastin were not reasonable and necessary.  And even if some prescriptions did not satisfy the reasonable and necessary requirement for the reasons Relator says, any such violation was not material to the Government's reimbursement decisions.  The district court thus correctly dismissed Relator's FCA claims.

### A.    The Amended Complaint Fails To Allege That The Claims At Issue Are False.

To establish that the reimbursement claims for Avastin are false, Relator must make the threshold showing that the prescriptions were not "reasonable and necessary."  Otherwise, there is no statutory or regulatory violation that could give

---

[7] In addition to this implied certification theory, Relator also states in a single sentence that the claims were "factually" false.  Relator Br. 31.  He does not offer any theory of factual falsity, other than to state without explanation that Avastin was not "medically appropriate."  That is not a claim of "factual" falsity; there is no allegation that Genentech "misrepresent[ed] what goods or services [were] provided."  *Wilkins*, 659 F.3d at 305.  Relator's claim that the treatment was not "medically appropriate" just restates his *legal* objection to reimbursement—that the treatment was not medically "reasonable and necessary."  Relator's claim that Genentech violated 31 U.S.C. § 3729(a)(1)(B), for making "false statements" material to payment of false claims (Relator Br. 33), likewise turns on his overarching theory that Avastin was prescribed for uses that were not "reasonable and necessary."

rise to a false certification claim. *See Universal Health Servs.*, 136 S. Ct. at 1999

(implied false certification claim arises from submitting claim while omitting

"violations of statutory, regulatory, or contractual requirements"). Relator has

failed to allege a false claim because CMS—not the prescribing physician—

determines whether a treatment is "reasonable and necessary" under the Medicare

statute, and there is no allegation that, but for the alleged fraud, CMS would have

considered any prescriptions of Avastin to be unreasonable or unnecessary.[8]

> **1.      The Claims For Avastin Are Not False Because The
>            Government Considers It Reasonable And Necessary For
>            The Uses At Issue.**

Under Medicare, the Government reimburses for treatments that are

"reasonable and necessary."  42 U.S.C. § 1395y(a)(1)(A).  There is no dispute that

CMS considers Avastin a "reasonable and necessary" cancer treatment, including

for the populations that Relator describes as "at-risk" for side effects.  CMS has

---

[8] The "reasonable and necessary" requirement applies only to reimbursement under
the Medicare program. *See* 42 U.S.C. § 1395y(a) ("[N]o payment may be made
under part A or part B of this [Medicare] subchapter . . . .").  Under Medicaid,
Avastin is a "covered outpatient drug" that is reimbursable for any "medically
accepted indication" (subject to other limitations not at issue). *See* 42 U.S.C.
§ 1396r-8(d)(1) & (k)(2)(6).  Although the complaint alleges "false" claims for
reimbursement under the Medicaid program, Relator does not argue on appeal that
Genentech caused Avastin to be prescribed for any use that is not medically
accepted.  Nor could he: every use at issue is either approved by the FDA or
supported by the authorized compendia. *See supra* pp. 5-7; *accord* 42 U.S.C.
§ 1396r-8(k)(2)(6).  All of Relator's Medicaid-related claims fail for this basic
reason; the discussion that follows explains why Relator's Medicare-related claims
similarly cannot succeed.

specifically determined that Avastin is "eligible for coverage when used in accordance with FDA-approved labeling," and "when the off-label use is supported in one of the authoritative drug compendia." Supp. App. 84-85. Neither is there any allegation that the FDA's approval, on which CMS relies, would have been withdrawn based on the information contained in Relator's preferred databases. App. 18-19; *see* Pl.'s Opp. to Mot. to Dismiss, Dkt. No. 33, at 2 (Relator's concession that "this case does not seek to show that the FDA would have acted differently"); Pl.'s Reply in Supp. of Mot. to Am. Compl., Dkt. No. 54, at 7 ("Relator does not argue that the FDA would have pulled Avastin from the market had Genentech been truthful.").[9]

Unable to contest that the Government considers the challenged Avastin prescriptions "reasonable and necessary," Relator seeks to shift the focus elsewhere. In his view, the statutory "reasonable and necessary" determination is made not by CMS but by the prescribing physician. Thus, Relator argues that if an analysis of Relator's preferred databases had revealed new safety-related information, and if Genentech had reported those hypothetical results differently,

---

[9] Off-label use of Avastin to treat metastatic breast cancer also remains supported by authoritative compendia, and CMS "has said that it is continuing to reimburse for this use." Proposal to Withdraw Approval for the Breast Cancer Indication for Avastin (Bevacizumab) (Decision of the Commissioner), Docket No. FDA 2010-N-0621, at 4 (Nov. 18, 2011); *see supra* p. 7 n.3.

then certain doctors would not have considered certain prescriptions of Avastin "reasonable and necessary." He maintains this is so even though CMS, based on its reimbursement determination, disagrees with such doctors, and continues, despite knowing of Relator's allegations, to regard Avastin as a "reasonable and necessary" treatment for all uses at issue here. The district court thus recognized that "[t]he central question" in this case, as Relator has framed it, is whether the "reasonable and necessary" determination is "made by the relevant administrative agencies or individual doctors." App. 13; *see also* App. 16 ("Put simply, this dispute comes down to whether medically 'reasonable and necessary' is assessed by doctors individually or is defined by the regulatory scheme.").

The answer to this "central" question is that the Government decides. The Supreme Court has specifically held that "[t]he [HHS] Secretary" makes the "clearly discretionary decision[]" of "whether a particular medical service is 'reasonable and necessary.'" *Heckler v. Ringer*, 466 U.S. 602, 617 (1984). Relator attempts to distinguish *Heckler* only by pointing out that it involved neither application to an individual patient nor claims under the FCA. Relator Br. 39. But he does not explain why those distinctions matter, and he cannot deny what the Supreme Court expressly held: the "reasonable and necessary" determination is made by the HHS Secretary. Other courts agree. *See New York ex rel. Bodnar v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990) ("The Medicare

statute unambiguously vests final authority in the Secretary, and no one else, to determine whether a service is reasonable and necessary, and thus whether reimbursement should be made."); *Hays v. Leavitt*, 583 F. Supp. 2d 62, 64 (D.D.C. 2008) ("reasonable and necessary" determination is the HHS Secretary's "responsibilit[y]," which she may delegate based on "direction [provided] to Medicare contractors through regulations"), *aff'd sub nom. Hays v. Sebelius*, 589 F.3d 1279 (D.C. Cir. 2009).

In its *amicus* brief, the Government agrees with the district court's view. Citing *Heckler* and other authorities, the Government acknowledges that "[t]he district court correctly recognized that CMS (or its administrative contractors) is ultimately responsible for determining whether a treatment is 'reasonable and necessary for the diagnosis or treatment of illness or injury.'" U.S. Amicus Br. 19 (quoting 42 U.S.C. § 1395y(a)(1)(A)); *see also id.* at 7 ("CMS has the ultimate authority to determine whether a treatment is 'reasonable and necessary' for purposes of reimbursement under Medicare Parts A and B.").[10]

---

[10] Relator claims that "[s]everal courts" recognize that physicians "ultimately determine" what is reasonable and necessary. Relator Br. 36. He cites only two cases, and neither says anything about whether the Government or individual doctors make the determination. In fact, both cases are consistent with the rule that the Government decides what is reasonable and necessary. *See U.S. ex rel. Galmines v. Novartis Pharm. Corp.*, No. 06-3213, 2013 WL 2649704, at *11 (E.D. Pa. June 13, 2013) (defendant allegedly promoted drug for off-label use that was not medically accepted and thus not reimbursable); *Strom ex rel. U.S. v. Scios,* (continued…)

Relator cannot shift the Government's statutory responsibility for the "reasonable and necessary" determination by invoking physicians' separate obligation "to assure, to the extent of [their] authority," that the services they provide and items they order are "medically necessary." 42 U.S.C. § 1320c-5(a); *see* Relator Br. 6, 8, 35, 37. Relator has been clear in both this Court and the district court that the false certification at issue was compliance with the "reasonable and necessary" requirement under § 1395y; he does not even mention § 1320c-5 or the "assurance" requirement in his complaint. *See* Relator Br. 1-2; Opp. to MTD at 1-2. Moreover, reliance on this separate statutory obligation would be incompatible with Relator's own theory. His allegation is that Genentech, by concealing information, caused providers to submit claims for reimbursement when they would otherwise have considered Avastin "unreasonable and unnecessary" in violation of § 1395y. But unlike that provision, § 1320c-5 is specifically directed to doctors, and imposes sanctions on physicians who defraud Medicare (for example, by submitting claims for fake patients or patients without

--------

*Inc.*, 676 F. Supp. 2d 884, 889 (N.D. Cal. 2009) (defendant allegedly promoted drug for off-label use that CMS specifically determined was not eligible for coverage). Relator likewise cites several cases for the proposition that a treatment is ineligible for reimbursement by Medicare if it is not "reasonable and necessary." Relator Br. 29. That is uncontroversial. The question in this case, which none of Relator's cases address, is *who decides* whether a treatment is reasonable and necessary.

the condition). 42 U.S.C. § 1320c-5(b) ("sanctions and penalties" for doctors). Relator's allegations do not suggest that any doctors failed in their duty to "assure," "to the extent of their authority," that the treatment was necessary, and so there can be no suggestion that § 1320c-5 was violated. Relator thus does not plead, and in any event could not successfully argue, that claims for Avastin falsely certified compliance with this separate statutory requirement.

Relator's theory that individual physicians make the "reasonable and necessary" determination not only conflicts with Supreme Court precedent and the Government's own view that it makes the ultimate statutory determination, but it also makes little sense. According to Relator, individual physicians "determine whether use of the drug is medically necessary for a patient and therefore actually reimbursable." Relator Br. 35. The Government's view of a drug, by contrast, is merely a "heuristic" intended to "aid physicians." *Id.* at 37-38. Under this view, the final gatekeeper to the Government's coffers would be not an accountable administrative agency, but any doctor with a prescription pad. While this case involves a claim that physicians would not have prescribed a treatment that CMS believes *is* reasonable and necessary, the same logic works in reverse: the Government would be required to pay for a treatment it does *not* believe is reasonable and necessary, so long as a physician honestly believes that it is. Relator's approach would lead to the bizarre result that the same treatment for the

same patient might be reimbursable if prescribed by one doctor, but not reimbursable if prescribed by another. There is no reason to think that Congress meant to create such a patchwork reimbursement regime. *See, e.g.*, *Heckler*, 466 U.S. at 617 (HHS Secretary makes the "reasonable and necessary" determination).

The fact that the Government makes the ultimate "reasonable and necessary" determination is dispositive of Relator's claims. Here, CMS has made the statutory determination that Avastin is reasonable and necessary for the uses at issue, and there is no allegation that Genentech's actions affected that decision (or the FDA's decisions that informed CMS's determination, given Relator's acknowledgement that the FDA would not have acted differently). *See* Pl.'s Opp. to Mot. to Dismiss, Dkt. No. 33, at 2. Relator has therefore not alleged that claims for Avastin violate any statute or regulation, and thus are not false.

Finally, even if individual physician decisionmaking *were* the proper focus, Relator's allegations would fail the plausibility standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Relator claims, based on the alleged statement of a single doctor, that had the allegedly withheld safety-related information been known, the "standard of care" among all physicians would have been to prescribe less Avastin to at-risk patients. App. 341. That allegation is flatly refuted by the judicially noticeable fact that Relator disclosed his allegations to the FDA five years ago, and yet the FDA has not withdrawn its approval, and CMS has not

stopped reimbursement of Avastin prescriptions.  *See* App. 337.  Given that the

Government continues to consider Avastin safe and effective, including for the "at-

risk" population, Relator's allegation that prescribing Avastin to that population is

effectively malpractice is simply not plausible.

> **2. Although Unnecessary To Its Holding, The District Court Correctly Concluded That Medically Accepted Uses Of A Drug Are Reasonable And Necessary.**

In addition to arguing that individual physicians have final authority over

what is "reasonable and necessary" under the Medicare statute, Relator spends

much of his brief on an argument that is a red herring.  He takes issue with the

district court's further conclusion that "the 'reasonable and necessary' standard [is]

coterminous with the 'medically accepted' requirement."  App. 14.  The

Government likewise wishes to preserve the possibility that a treatment could be

"medically accepted" (*i.e.*, approved by the FDA or supported by the compendia)

but not "reasonable and necessary."  U.S. Amicus Br. 19-22.  But whether these

two inquiries are completely "coterminous" in every case, they certainly are in *this*

case.  CMS has determined that Avastin is eligible for reimbursement for uses that

are FDA approved or supported by compendia—in other words, it is "reasonable

and necessary" for any "medically accepted" use.  *See* Supp. App. 84-85.

Although this Court need not reach the issue, the district court correctly

concluded that a prescription for a "medically accepted indication" necessarily

satisfies the "reasonable and necessary" requirement.  A drug is used for a "medically accepted indication" if the FDA has approved the use, or the use is supported by an authoritative compendium.  42 U.S.C. § 1395x(t)(2)(B).  As several courts in this circuit have recognized, it would make little sense to deem a "medically accepted" use, which the FDA or authorized compendia have concluded is safe and effective, to be unnecessary or unreasonable for the approved use.  *See In re Plavix Mktg., Sales Practices & Prods. Liab. Litig.*, 123 F. Supp. 3d 584, 604 (D.N.J. 2015) ("[A] drug prescribed for its on-label use—by definition—means that the prescription is medically reasonable for its intended purpose by virtue of the FDA approval process."); *U.S. ex rel. Cestra v. Cephalon, Inc.*, No. 14-1842, 2015 WL 3498761, at *8 (E.D. Pa. June 3, 2015) ("Whether prescribing a drug for a particular condition is reasonable and necessary is typically determined by considering whether the drug is prescribed for a 'medically accepted indication' that is reimbursable under Medicare and Medicaid."); *U.S. ex rel. Simpson v. Bayer Corp.*, No. 05-3895 (JLL), 2013 WL 4710587, at *11 n.16 (D.N.J. Aug. 30, 2013) ("As per the Medicare Benefit Policy Manual Chapter 15 § 50.42, reasonable and necessary uses include those that are 'medically accepted' . . . .").

The Government disagrees with this view, arguing that "reasonable and necessary" and "medically accepted" should not be viewed as coterminous because doing so would "tie [CMS's] hands."  U.S. Amicus Br. 21 (quoting *Almy v.*

*Sebelius*, 679 F.3d 297, 308 (4th Cir. 2012)).[11]  But CMS's hands are not tied

because it has significant authority in determining what is "medically accepted,"

which in turn affects what is "reasonable and necessary."  *See* 42 U.S.C.

§ 1395x(t)(2)(B)(ii)(I).  The Medicare statute expressly authorizes the Secretary to

decide which compendia should be used to determine medically accepted off-label

uses, and also to overrule the compendia by determining that, notwithstanding the

compendia, a particular "use is not medically appropriate."  *Id.*  CMS's hands are

tied only insofar as it cannot override the FDA's decision that a particular

approved use is safe and effective, which makes sense given that the FDA, not

CMS, has the mandate and resources necessary to make that complex

determination.

Both Relator and the Government argue that "reasonable and necessary"

must mean something different from "medically accepted" because the former

focuses on the "individual patient."  Relator Br. 36; U.S. Amicus Br. 17.  But the

"medically accepted" requirement does not ignore the individual patient or

"reduce[] the practice of medicine to doctors mechanically applying rules that

---

[11] As another court has pointed out, "reliance on *Almy*" for this proposition is
"misplaced."  *Plavix*, 123 F. Supp. 3d at 605 n.11.  *Almy* concerned "medical
equipment" under Medicare Part B, and the statute "explicitly provides CMS with
the discretion to make certain safety determinations as to medical equipment" that
does not extend to other determinations delegated to the FDA.  *Id.*

various federal agencies create." Relator Br. 36. When the FDA approves a drug it does so not in the abstract, but for particular classes of patients with particular conditions for whom the drug has been found safe and effective. Thus, a drug can only be used for a "medically accepted indication" if it is approved by the FDA or supported by a compendium *and the patient has the indicated condition*, something the doctor must use her professional judgment to assess. It would not, for example, be a "medically accepted" use to prescribe an FDA-approved diabetes drug to a non-diabetic patient.[12]

To support its view that CMS may second-guess the FDA by determining that an FDA-approved use of a drug is unreasonable and unnecessary, the Government points to CMS guidance discussing "route of administration" for particular medications. U.S. Amicus Br. 9, 21. But "route of administration" provides no basis for distinguishing between the "reasonable and necessary" and "medically accepted" determinations, because FDA approval of a drug is limited to the approved route of administration. 21 C.F.R. § 314.50(a); *see also In re*

---

[12] The Medicare Benefit Policy Manual's recognition that a treatment must be "reasonable and necessary for the individual patient" does not imply that the "medically accepted use" determination ignores the patient. Relator Br. 36 (quoting Medicare Benefit Policy Manual, CMS Pub. 100-2 Chapter 1, § 30). More importantly, it does not say that the "reasonable and necessary" determination is made by the physician.

*Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 751 F.3d 150, 153 (3d Cir. 2014) (noting "route of administration" as a limitation on FDA approval).[13]

Ultimately, if there is any daylight between the statutory phrases "reasonable and necessary" and "medically accepted," it is insubstantial. And it is certainly not implicated in a case where CMS has said it *will* reimburse for any use approved by the FDA or supported by the compendia, *i.e.*, any "medically accepted" use. Whether or not the Court elects to address the relationship between "reasonable and necessary" and "medically accepted," Relator has failed to allege any claims relating to Avastin that were not reasonable and necessary as determined by the Government. Accordingly, the district court was correct to dismiss the amended complaint for failure to allege any "false" claims.

## B.     The Amended Complaint Fails To Allege Materiality.

Because the "reasonable and necessary" determination is made by the Government, and there is no allegation that the Government does not consider Avastin reasonable and necessary, Relator has failed to identify a regulatory violation that makes claims for Avastin "false." But even if his physician-based theory were viable, and he could plausibly allege that physicians would not have

---

[13] In fact, the Medicare Benefit Policy Manual specifically links the question of whether an injection is "reasonable and necessary" to whether it is "indicated" under an "accepted standard of medical practice"—in other words, whether that route of administration reflects a medically accepted indication. Medicare Benefit Policy Manual, CMS Pub. 100-2, Chapter 15, § 50.4.3.

considered Avastin reasonable and necessary but for Genentech's choice of databases, Relator's claims would still fail on materiality grounds.

Even when a claim is false, it is not actionable under the FCA unless the "misrepresentation about compliance with a statutory, regulatory, or contractual requirement [is] material to the Government's payment decision." *Universal Health Servs.*, 136 S. Ct. at 2002. As the Supreme Court recently explained, this "materiality standard is demanding," because the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003. Where the Government pays a particular claim or type of claim despite actual knowledge of a violation, that is "very strong evidence" that the violation is not material. *Id.* The Supreme Court also confirmed that failure to plead facts meeting the "rigorous" materiality standard may appropriately be decided on a motion to dismiss. *Id.* at 2004 n.6.[14]

---

[14] This Court has also held that a relator cannot plead a false claim if he does not allege that, "if the Government had been aware of the defendant's violations . . . , it would not have paid the defendant's claims." *Wilkins*, 659 F.3d at 307. This Court has previously identified this issue as relevant to whether the relator had sufficiently pleaded an implied certification theory, whereas the Supreme Court has clarified that it is part of the materiality analysis. *Compare id.*, *with Universal Health Servs.*, 136 S. Ct. at 2002-04. But the substantive rule is the same. Under the decisions of both this Circuit and the Supreme Court, a relator cannot plead an FCA claim without alleging that the alleged fraud influenced the government's decision to pay the claim.

The district court held—and Relator does not dispute—that "[t]here are no factual allegations showing that CMS would not have reimbursed these claims had [Genentech's alleged safety-related reporting] deficiencies been cured." App. 18. Nor could Relator make such an allegation: CMS has said that it will reimburse for FDA-approved uses (and supported off-label uses), and Relator does not contend that the FDA would have modified its approval had Genentech used his preferred databases. *See* Supp. App. 84-85; Pl.'s Opp. to Mot. to Dismiss, Dkt. No. 33, at 2. To the contrary, the FDA has known about Relator's allegations for five years, and not only has it never revoked approval for Avastin for the alleged "at-risk" patients, but it has affirmatively approved Avastin for additional indications. Thus, even if physicians who represented that Avastin was "reasonable and necessary" would change their minds in light of Relator's allegations, and even if that meant that their claims for reimbursement retroactively came to violate the Medicare statute, the Government would still pay. This fact "is very strong evidence" that even if claims were false because physicians would not have considered Avastin reasonable and necessary, any violation of that requirement "[was] not material." *Universal Health Servs.*, 136 S. Ct. at 2003. Because nothing in the complaint overcomes this "very strong evidence," Relator cannot meet the "rigorous" showing of materiality needed to state a claim.

**C.    The District Court's Conclusion That Relator Has Not Adequately Pleaded False Claims Does Not "Encourage Fraud."**

Relator devotes several pages of his brief mounting a policy objection to the district court's ruling, claiming that "it created a loophole in the FCA" under which "drug companies [can] spread false information . . . without fear of being held accountable."  Relator Br. 42-43.  That is simply not the case.

Relator misreads the district court's decision as "allow[ing] the success of Genentech's widespread fraud (which impacted the FDA and the Compendia) to immunize its fraud on physicians."  Relator Br. 43.  But Relator's critical premise that the alleged fraud "impacted the FDA and the Compendia"—made in a passing parenthetical—is entirely unsupported.  The district court held that the complaint "does not allege any facts to show that CMS would find Avastin not to be medically reasonable and necessary for any particular use in the but-for world."  App. 17.  Relator cannot and does not present any argument that this conclusion was wrong.  *See supra* pp. 26-27.

Similarly, the district court neither accepted nor rejected the theory that FCA liability is available where "defendants defrauded the Compendia into approving the use of a drug."  Relator Br. 44.  The district court simply concluded that the complaint's "single paragraph" supporting this theory was "plainly insufficient," since it lacked "any allegation that the compendia would have changed" but for the alleged fraud.  App. 19.  Again, Relator alludes in passing to a fraud on the

compendia, but he does not challenge on appeal the district court's holding that his allegations were insufficient. Nor could he credibly do so, given that the complaint fails to plead with particularity any facts supporting this claim of "fraud," including the specific compendia allegedly defrauded, the relevant decision-makers for those compendia, the compendia's procedures for making determinations, and how Genentech's actions could have affected those decisions.

Contrary to Relator's sweeping characterization, the district court did not rule out FCA liability on a properly-pleaded fraud-on-the-FDA or fraud-on-the-compendia theory. It simply resolved this case on the basis of Relator's own deficient pleading. Moreover, even if such theories are not viable, Relator is wrong to claim that pharmaceutical companies could commit fraud "without fear of being held accountable." Relator Br. 43. As the Supreme Court has acknowledged, federal law "amply empowers the FDA to punish and deter fraud against the Administration." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001). Nothing about the dismissal of Relator's case will "encourage[] fraud." Relator Br. 42.

### D. The Government's Alternative Theories Are Not Presented By This Case And Would Not Supply A Basis For Reviving Relator's Claims.

The Government has filed an *amicus* brief in which it takes no position on whether Relator has stated a claim. However, the Government objects to certain

language in the district court's opinion, and identifies two potential theories for FCA liability relating to Medicare reimbursement that it believes could be viable in an appropriate case. Neither of these theories is advanced by Relator, and in any event neither is a basis for reversal.

*First*, the Government argues that, "in rare cases," violations of "adverse-event-reporting requirements" could lead to FCA liability. U.S. Amicus Br. 22. Specifically, the Government contends that FCA liability would be appropriate where "fraudulent statements made to the FDA" had "actually cause[d] FDA to approve the drug application or decline to revoke that approval." *Id.* at 25. No such theory is presented here. As the district court recognized, the complaint includes "no allegations that the FDA would not have approved Avastin for particular indications," or revoked approval for Avastin, had Genentech chosen different databases for its adverse event reporting. App. 18-19. To the contrary, Relator has disavowed any intent "to show that the FDA would have acted differently." Pl.'s Opp. to Mot. to Dismiss, Dkt. No. 33, at 2. Moreover, Relator could not plausibly make such an allegation in view of the fact that the FDA has approved three new indications for Avastin while taking no action related to Relator's claims since they were disclosed five years ago. *See* App. 337; Supp. App. 59-73. This case is therefore not the "rare" one in which the Government's fraud-on-the-FDA theory, if it is viable, could be advanced.

*Second*, the Government states that FCA liability "may" attach if a fraud was "intended to induce a provider" to "certify [a] treatment's medical necessity." U.S. Amicus Br. 29-30. As noted above, the Government agrees with the district court that the appropriate federal agencies, not individual physicians, determine whether the statutory "reasonable and necessary" requirement is satisfied. *See supra* p. 29. But because "physician action is an essential prerequisite to reimbursement," the Government maintains that a defendant may be liable if "the connection between the fraud [directed at the doctors] and the claim is sufficiently close." U.S. Amicus Br. 30, 32. Its theory is that a defendant could be responsible for a false claim for reimbursement if it commits a fraud that is "intended to induce physicians to prescribe a drug and it was reasonably foreseeable that the federal government would pay for the treatment." *Id.* at 32.[15]

This argument too is not advanced by Relator. As his brief makes clear, Relator recognizes that his theory rises and falls on whether physicians or the

---

[15] In support of this argument, the Government points out that "[i]n some cases," a physician must attest to the "medical necessity" of a treatment by submitting CMS Form 1500. U.S. Amicus Br. 29-30. Relator's brief does not mention Form 1500 once—a telling indication that Relator is not advancing the theory articulated by the Government. Moreover, Form 1500 never uses the phrase "reasonable and necessary," the statutory requirement that is the basis of Relator's false certification theory. And notwithstanding the Government's reference to Form 1500, it still concludes (in disagreement with Relator) that individual physicians do not make the ultimate statutory "reasonable and necessary" determination. U.S. Amicus Br. 7, 19.

Government have the authority to make the "reasonable and necessary" determination. *See* Relator Br. 34 ("The district court rejected Relator's theory of FCA liability based on its erroneous interpretation that what is 'medically reasonable and necessary' under 42 U.S.C. § 1395y(a)(1)(A) 'is a determination made by the relevant agency, not individual doctors.'" (citation omitted)). Thus, the complaint does not even attempt to allege that Genentech "intended to induce physicians to prescribe a drug," which is a necessary element of the Government's proposed theory. U.S. Amicus Br. 32. *See* App. 328 (alleging that a "goal[]" of the alleged fraud was "to generate information . . . that could be leveraged by company executives in their preparation and submission of regulatory filings," but saying nothing about intent to induce any action by physicians). Indeed, the complaint takes care to disclaim the notion that Relator would have to prove "specific intent to defraud" anyone. App. 279.

If the Court does address the Government's fraud-in-the-inducement theory, it should not adopt it, at least insofar as it could reach a case like this one. The Government appears to argue that, at least in some cases, a relator could plead an FCA claim based solely on evidence that a doctor was fraudulently induced to prescribe a treatment, *even if* CMS, with full knowledge of the alleged fraud, would still find the treatment reasonable and necessary and pay the claim. If that is the Government's theory, it cannot be squared with the requirement that any fraud

must cause a "false" claim to be presented and be material to the Government's decision to pay the claim.

"The False Claims Act is not 'an all-purpose antifraud statute.'" *Universal Health Servs.*, 136 S. Ct. at 2003 (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)). It is not, therefore, a violation of the FCA to induce someone to present a *true* claim for a treatment the Government believes is reasonable and necessary. Neither would such a fraud be material, since the Government would still be willing to reimburse. *See id.* at 2003-04 ("[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements were not material."); *Wilkins*, 659 F.3d at 307 (claim is false only if the Government "would not have paid" it "if [it] had been aware" of the facts).

Such a theory would significantly expand the reach of the FCA beyond the fraud-in-the-inducement cases the Government cites. *Cf. Universal Health Servs.*, 136 S. Ct. at 2004 (rejecting the Government's "extraordinarily expansive view of [FCA] liability"). The seminal such case is *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). In *Hess*, "contracts were obtained by a successfully executed conspiracy to remove all possible competition from 'competitive bidding.'" *Id.* at 543. The "taint" of this fraud "did not spend itself with the execution of the

- 45 -

contract," but extended to the subsequent payments that flowed from the contract. *Id.* The reason this fraud-in-the-inducement led to false claims, however, was that "[t]he bidding itself was a federal requirement" that was violated. *Id.* And the reason that violation was material was that if the Government had "known the bids were collusive," its "money would never have been placed in the joint fund for payment" to the defendants. *Id.* Here, by contrast, even if doctors were induced to prescribe Avastin, there is no allegation the Government paid for any treatments it did not consider "reasonable and necessary." In other words, the alleged fraud did not lead to any claim that violated a regulation, let alone one that was material to payment. For there to be "an indirect mulcting of the government," U.S. Amicus Br. 33 (quoting *United States v. Lagerbusch*, 361 F.2d 449, 449 (3d Cir. 1966)), the Government must actually be mulcted.

## III. The District Court Properly Dismissed Relator's Remaining Claims.

The district court also dismissed Relator's reverse false claim and his state-law and conspiracy claims. Because these claims also depend on his flawed view that prescribing physicians make the required reimbursement determination, the dismissal of these claims should also be affirmed.

### A. The Reverse False Claim Count Fails.

Relator attempts to cast the mirror-image of his claims as "reverse false claims." 31 U.S.C. § 3729(a)(1)(G). Under the reverse false claim provision of

the FCA, a defendant is liable for a "fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid." *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 513 n.12 (3d Cir. 2007). To state a claim, Relator must adequately allege an "obligation to pay or transmit money or property to the Government," and that the Defendant "knowingly ma[d]e, use[d], or cause[d] to be made or used, a false record or statement material" to that obligation, or knowingly "conceal[ed]" or "improperly avoid[ed]" the obligation. 31 U.S.C. § 3729(a)(1)(G).[16]

The district court held that Relator's reverse false claim failed because it was redundant of his traditional FCA claim. App. 20-21. Relator does not dispute that a reverse false claim may not be redundant of his other false claim counts. *See* Relator Br. 52-53. For good reason: the "purpose" of the reverse false claim provision "was not to provide a redundant basis to state a false statement claim" under other provisions of the FCA. *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010). Rather, the purpose was to make one

_____

[16] Liability for concealing or avoiding an obligation was added to the FCA in 2009, as Relator notes. Relator Br. 47-48 & n.13. Because that change is not retroactive, Relator may rely on this provision only for obligations to the Government that arose after the 2009 amendment. *See United States ex rel. Stone v. OmniCare, Inc.*, No. 09 C 4319, 2011 WL 2669659, at *4 (N.D. Ill. Jul. 7, 2011). Relator's complaint contains no allegation that Genentech caused the submission of any affirmative false statement or record that was material to an obligation to pay the Government.

who "avoid[s] paying money . . . *equally* liable under the Act *as if* he had submitted a false claim."  S. Rep. No. 99-345, at 15 (1986) (emphasis added). Courts have accordingly rejected claims under § 3279(a)(1)(G) that simply "recast[]" a false claim count by alleging the defendant "failed to refund the false claims that the government paid."  *Thomas*, 708 F. Supp. 2d at 514; *see also United States ex rel. Sobek v. Educ. Mgmt., LLC*, No. 10-131, 2013 WL 2404082, at *29 (W.D. Pa. May 31, 2013); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338-39 & n.142 (S.D.N.Y. 2004).

Instead, Relator maintains that his § 3729(a)(1)(G) claims are not redundant, because "the obligations of providers and states to refund money to the government are separate from Genentech's conduct that gives rise to direct false claims."  Relator Br. 53.  Relator does not explain this assertion, and the rest of his brief refutes it.  The "obligation" Relator points to is to refund "overpayments" from the Government, and the "overpayments" he identifies are "money for treatments that were *not reasonable or necessary*."  Relator Br. 48 (emphasis added); *see also id.* at 51 (providers and states have obligation "to return federal dollars that have been used for medically unnecessary treatment").  In other words, providers were obligated to return money that the Government reimbursed for Avastin prescriptions that were not reasonable and necessary—the very same reimbursement requests that are the foundation of the direct false claims that

Relator alleges. If this is not a case of simply recasting a direct false claim as a reverse false claim, it is hard to see what would be.

Relator identifies no case allowing a reverse false claim theory to proceed in tandem with a mirror-image direct false claim theory. Instead, he cites cases that do not pose the redundancy issue at all. For example, he cites a Fifth Circuit decision that involved *only* reverse false claims, where state Medicaid agencies made specific reimbursement requests that the defendant rejected. *See United States v. Caremark, Inc.*, 634 F.3d 808, 814-15 (5th Cir. 2011). The other cases he cites are similarly inapposite. *See, e.g.*, *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1220-22 (11th Cir. 2012) (reverse false claim based on scheme to avoid returning overpayments to Government, with no allegation that overpayments were caused by direct false claims made to Government).

Relator also makes a cursory argument that the "direct" and "reverse" false claims are not redundant because they "can be supported by different facts." Relator Br. 53. He claims that Genentech "suppressed material information and made false statements in response to a specific inquiry from CMS into the costs for treating adverse events of Avastin." *Id.* But just as Relator fails to allege that CMS would have made any different reimbursement decisions, neither does he allege that CMS would have demanded refunds of previous reimbursements if Genentech had responded differently to its 2011 request. Indeed, Relator flatly

misstates his own complaint when he asserts that "[t]he CMS inquiry was specifically designed to determine how much money might need to be repaid to the government." *Id.* The complaint, by contrast, alleges only that CMS planned to use this data "to set reimbursement rates for Avastin use." App. 338. There is no allegation, let alone a plausible allegation, that CMS would have decided that providers owed it refunds based on a later assessment of the cost of treating Avastin's side effects.

Finally, even if the Court were to conclude that a redundant "reverse false claim" theory were viable, Relator's claim would still fail for the same reason his primary claims fail—all of the reimbursements at issue were for "reasonable and necessary" treatments. Because Relator has not adequately alleged facts establishing the contrary, no provider had an obligation to refund the Government for reimbursements received on Avastin.

## B.     The State Law And Conspiracy Counts Fail.

The district court also properly dismissed the state law and conspiracy claims. Relator does not dispute that these claims rise or fall with the federal false claims. He simply argues that because "dismissal of the FCA claims was in error, the dismissal of the other claims should be reversed." Relator Br. 54. Because the dismissal of the FCA claims was proper, the district court did not err in dismissing the remaining claims as well.

Moreover, Relator's state law claims fail for the further reason that they concern only reimbursements under the Medicaid program. *See, e.g.*, App. 347. As Relator does not dispute, Medicare's "reasonable and necessary" requirement—the basis of Relator's theory that reimbursement claims were false—does not apply to Medicaid. *See supra* p. 26 n.8.

## IV. The District Court Did Not Abuse Its Discretion In Denying Leave To Amend.

Relator objects that he was not given a second opportunity to amend his complaint. He did not, however, explain to the district court *how* he proposed to amend his complaint, or present a proper motion for leave to amend as required by the Local Rules. D.N.J. Rule 7(f) ("[T]he moving party shall attach to the motion a copy of the proposed pleading or amendments . . . ."). Relator's request came only in a single clause of the concluding sentence of his opposition to the motion to dismiss. Without any explanation, Relator simply asked that, "alternatively," he "be granted leave to amend." Pl.'s Br. in Opp. to Mot. to Dismiss Am. Compl., Dkt. No. 73, at 40 (Mar. 2, 2015).

The district court did not abuse its discretion in denying this cursory and unsupported request. "While Federal Rule 15(a) provides that leave to amend shall be freely given when justice so requires, a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of

Rule 15(a)." *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 427 (D.C. Cir. 2004) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1280 (D.C. Cir. 1994)); *see also Long v. Satz*, 181 F.3d 1275, 1279-80 (11th Cir. 1999) (where "request for leave to amend was included in the memorandum [plaintiff] filed in opposition to the motion to dismiss," and "she failed to attach the amendment or set forth the substance of the proposed amendment," she could not "argu[e] on appeal that the district court abused its discretion by denying her leave to amend her complaint"); *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 409 (8th Cir.1999) ("parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim").

Even on appeal, Relator fails to identify what additional facts he would plead to cure the defects in his complaint, which he has already had one opportunity to amend. This Court has explained that leave to amend is properly denied "where pleading deficiencies would not have been remedied by proposed amendments." *Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007). It cannot be an abuse of discretion to deny leave to amend when the plaintiff does not even explain what the "proposed amendments" would be. That omission is especially glaring given that Relator has already disavowed the only allegations he might

conceivably wish to add—some theory that the FDA or CMS would have acted differently.

## V. The District Court Lacked Personal Jurisdiction Over The Foreign Defendants.

The claims against F. Hoffman-La Roche Ltd and Roche Holding Ltd (the "Foreign Defendants") should also be dismissed for the independent reason that the district court lacked personal jurisdiction over them. Relator's 429-page amended complaint barely mentions the Foreign Defendants, and includes no substantive allegations against them. App. 266, 278, 346-47. Moreover, the Rule 12(b)(1) record includes evidence of the lack of connections between the Foreign Defendants and the United States. There is no basis for either general or specific personal jurisdiction over the Foreign Defendants.[17]

A. General jurisdiction over a corporation exists "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) (quoting *Goodyear Dunlop Tires Operations,*

---

[17] The Foreign Defendants do not object to the decision of the district court not to reach issues of personal jurisdiction in light of its decision to grant the U.S. Defendants' motions to dismiss for failure to state a claim. We nonetheless provide a brief discussion of the jurisdictional issue in the event this Court determines that it should address the jurisdictional objection before addressing the dismissal for failure to state a claim. *Cf. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998).

*S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "A corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* at 762 n.20.

The Foreign Defendants have no office, telephone listing, or mailing address in the United States; they have no property in the United States; they are not licensed to do business in the United States; they do not manufacture, design, package, sell, or distribute any products, including pharmaceuticals, in the United States; they do not maintain any inventory in the United States; they do not solicit sales in the United States; they do not have bank accounts in the United States; and they do not pay taxes in the United States. Supp. App. 87-88, 92-93. Even before *Daimler*, there would have been no basis to find general jurisdiction on such facts. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 262 (3d Cir. 2000) ("there is simply no basis for concluding [the defendant] has a continuous presence in the United States" where "it has no personnel or facilities here" and has not "advertised or solicited business here"). There is certainly no basis for general jurisdiction under *Daimler*'s more stringent test.

In the district court, Relator argued that general jurisdiction existed based on on his conclusory assertion that the U.S. and Foreign Defendants are "alter egos." Pl.'s Br. in Opp. to Foreign Defs.' Mot. to Dismiss, Dkt. No. 87, at 14-16 (Aug. 3, 2015). To establish alter ego status, a plaintiff must show "that the controlling corporation wholly ignored the separate status of the controlled corporation and so

dominated and controlled its affairs that its separate existence [is] a mere sham."

*Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 14 (3d Cir. 1990). Parent corporations

are "assumed" to exercise control over their subsidiaries "to a substantial degree,"

but to show alter ego status, a plaintiff must go much further and show "complete

domination." *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150, 152 (3d

Cir. 1988). The undisputed affidavits make clear that the U.S. Defendants'

separate existence is no "mere sham." Supp. App. 88-89, 94. Even Relator alleges

that adverse event reporting—the focus of this case—is controlled by a Genentech

executive. App. 318. There is simply nothing in the complaint or the record that

could meet Relator's heavy burden of proving alter ego status.

B. Relator's meager allegations concerning the Foreign Defendants also fail

to establish that the district court had specific jurisdiction. Exercise of specific

jurisdiction is proper only if (1) "the defendant . . . purposefully directed his

activities at the forum"; (2) "the plaintiff's claim . . . arise[s] out of [and] relate[s]

to at least one of those specific activities"; and (3) "the assertion of jurisdiction

otherwise comports with fair play and substantial justice." *Marten v. Godwin*, 499

F.3d 290, 296 (3d Cir. 2007) (citation and internal quotation marks omitted). None

of these prongs is met.

As the complaint acknowledges, Genentech—not the Foreign Defendants—

controls sales and marketing in the United States, and is responsible for reporting

safety-related issues to the FDA.  App. 281, 285-86; *see also* Supp. App. 97, 100.

Relator does not allege any activities purposely directed at the forum, and certainly

no activities that led to the alleged submission of false claims.  Under these

circumstances, moreover, it would be unfair to hale the Foreign Defendants into

this forum on these claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Respectfully submitted,

/s/ Mark W. Mosier

Lawrence S. Lustberg
Amanda B. Protess
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4731
llustberg@gibbonslaw.com

Matthew J. O'Connor
Mark W. Mosier
Matthew F. Dunn
David M. Zionts
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000
mmosier@cov.com

*Counsel for Defendants-Appellees*

July 15, 2016

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,391 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

  /s/ Mark W. Mosier
Mark W. Mosier

July 15, 2016

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on July 15, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mark W. Mosier
Mark W. Mosier

July 15, 2016